# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **ROLANDA LLOYD,** | **CASE NO. 1:18-CV-01557** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY, et al.,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendants.** | |

This matter comes before the Court upon the Motion for Summary Judgment of Greater Cleveland Regional Transit Authority ("GCRTA") and Jack Barnett ("Barnett") (collectively, "Defendants"). (Doc. No. 37.)  Plaintiff Rolanda Lloyd ("Lloyd") filed a brief in opposition on March 31, 2020, to which Defendants replied on April 17, 2020.  (Doc. Nos. 46, 49.)  For the following reasons, Defendants' Motion for Summary Judgment (Doc. No. 37) is GRANTED IN PART and DENIED IN PART.

## I.  Background

### a.  Factual Background

In 1994, Lloyd began working for GCRTA as a train operator and has held the same position since then.  (Doc. No. 34-1 at 23-24.)  In February 2015, Lloyd's son was murdered.  (Doc. No. 46-1 at ¶ 3.)  As a result, Lloyd suffered emotional distress and was diagnosed with post-traumatic stress disorder ("PTSD").  (Doc. No. 34-1 at 26.)

In August 2015, due to her PTSD, Lloyd applied for intermittent leave under the Family and Medical Leave Act ("FMLA"), which GCRTA approved.  (*Id.* at 33.)  Lloyd requested intermittent leave in order to attend counseling sessions and to take time off work when necessary based on her

emotional distress.  (*Id.* at 26, 35; Doc. No. 46-1 at ¶ 5.)  Lloyd could not predict when her emotional distress would arise such that she would need to take off work, and it could occur when she was driving a train.  (Doc. No. 34-1 at 26-27.)  According to Lloyd, she never requested off from work or requested to be removed from work as a result of her PTSD or in conjunction with her FMLA leave. (Doc. No. 46-1 at ¶ 10.)[1]  In February 2016, Lloyd again applied for, and was granted, intermittent leave under the FMLA based on her PTSD.  (Doc. No. 34-1 at 35.)

On March 11, 2016, certain trains were experiencing a temporary shutdown and Lloyd, as well as other train operators, had to go to Tower City to pick up their trains instead of their usual posts.  (*Id.* at 90.)  Lloyd chose to drive her own vehicle, rather than ride with her supervisor in a GCRTA vehicle, and arrived late to pick up her train at Tower City.  (*Id.* at 90-91.)  As a result, another operator took her train out to keep it on schedule.  (*Id.* at 90-91, 119.)  After her train returned, Lloyd boarded it and waited for her departure time.  (*Id.* at 91.)  Shortly thereafter, Lloyd was approached by GCRTA's Service Quality Director, Richard Newell ("Newell"), and his supervisor, Anthony Harris ("Harris").  (*Id.*)  They had a confrontation during which Lloyd claims that Newell was rude and disrespectful to her.  (*Id.*; Doc. No. 46-1 at ¶ 37.)  Lloyd then went to the restroom, and when she returned to her train, Harris told her that she was relieved from duty and to report to the dispatcher.  (Doc. No. 34-1 at 91-92.)  Another train operator, Leroy Fazl ("Fazl"), was also late to arrive at Tower City that day and missed his train.  (*Id.* at 93.)  However, Fazl was not sent home, and nothing happened to him.  (*Id.*)

---

[1] Defendants dispute this and assert that Lloyd took 174 hours of FMLA leave from 2015 to 2016.  (Doc. No. 49-1 at ¶ 2.)

On March 22, 2016, believing that she had been singled out and harassed for missing her train, Lloyd submitted a gender discrimination complaint against Newell to GCRTA's internal Office of Equal Opportunity.  (*Id.* at 93, 104.)  GCRTA conducted an investigation and determined that there was insufficient evidence to substantiate the claim of gender discrimination.  (*Id.* at 105.)

In April 2016, shortly after Lloyd filed her gender discrimination complaint, Barnett became Lloyd's supervisor as the acting Rail Transportation Manager.  (Doc. No. 34-2 at 16-17.)  While Barnett was not Lloyd's supervisor at the time of her gender discrimination complaint, Lloyd contends that he received her complaint and was aware of it.  (Doc. No. 46-1 at ¶ 37.)  Barnett claims that in 2016, he did not know that Lloyd had filed an internal complaint against Newell.  (Doc. No. 37-2 at ¶ 7.)

On May 9, 2016, Barnett issued Lloyd a First Written Reminder for her trains being late. (Doc. No. 34-2 at 54-55.)  GCRTA provides train operators a five-minute grace period in which it will not count a train as late.  (*Id.* at 57.)  However, once a train is six minutes behind schedule, it is documented as being late.  (*Id.*)  From January 1, 2016 to May 3, 2016, Lloyd's train was late fifteen times, which resulted in the First Written Reminder.  (*Id.* at 55, 58.)  From September 8, 2015 to May 3, 2016, Lloyd's train was late twenty-one times.  (Doc. No. 37-2 at ¶ 4.)  After the First Written Reminder, on May 16, 2016, Lloyd's train was late again.  (Doc. No. 34-2 at 58.)  As a result, Barnett issued Lloyd a Second Written Reminder.  (*Id.*)

Lloyd claims that her trains were late because she adhered to the speed limits on her route and through slow zones and because of necessary restroom breaks.  (Doc. No. 46-1 at ¶ 44.)  A slow zone is an area where train speeds have been reduced to a determined safe speed due to an issue with the track, overhead, or other conditions.  (Doc. No. 37-2 at ¶ 8.)  Lloyd further asserts that when she was

3

previously sent for retraining for not keeping her train on schedule in March 2016, the trainer stated that she was late as a result of operating the train at the proper speed limits and not due to any fault of her own.  (*Id.* at ¶ 6; Doc. No. 46-1 at ¶ 38.)  However, at his deposition, Barnett testified that other similarly situated operators were not late to the same degree, frequency, and severity as Lloyd.  (Doc. No. 34-2 at 56.)  In addition, train operators are entitled to a break built into their schedule, and recovery time also is built into the end of a train's trip.  (Doc. No. 34-1 at 109; Doc. No. 34-2 at 68-69.)

On August 16, 2016, Lloyd again applied for intermittent FMLA leave based on her PTSD. (Doc. No. 46-1 at ¶ 9.)  Dr. Himanshu Dubey ("Dubey"), Lloyd's primary care provider, completed the application for Lloyd.  (*Id.*)  Therein, in response to a question inquiring as to whether Lloyd would "be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery," Dubey indicated it was "unknown."  (Doc. No. 35-1 at 14.)  In response to whether Lloyd's condition would "cause episodic flare-ups periodically preventing the employee from performing his/her job functions," Dubey checked the box marked "Yes," and wrote this would occur as result of her "PTSD/mood disorder."  (*Id.*)  He also estimated the "frequency of flare-ups and the duration of related incapacity" would be four times per month and one to five days per episode.  (*Id.*)

GCRTA's Policies and Procedures Manual (the "Manual") provides that rail operators must "be free of medical conditions that could pose a direct threat to the health and safety [of themselves] or others."  (*Id.* at 25.)  Additionally, the Manual provides that to be qualified as a driver, an individual must have "no mental, nervous, organic or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a motor or rail vehicle safely."  (*Id.*)  Similarly, pursuant to Department

4

of Transportation ("DOT") requirements, a person is qualified to drive a commercial motor vehicle if that person "[h]as no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely."  (*Id.* at 33.)  The DOT requirements further specify that "[d]isorders of a periodically incapacitating nature, even in the early stages of development, may warrant disqualification."  (*Id.* at 34.)  Additionally, the DOT guidelines provide that a medical examiner's fundamental obligation during a psychological assessment "is to establish whether a driver has a psychological disease or disorder that increases the risk for periodic, residual, or insidious onset of cognitive, behavioral, and/or functional impairment that endangers public safety."  (*Id.*)

In July 2016, MaTia Phillips ("Phillips") became an occupational health specialist for GCRTA, taking over for Ernell Branch ("Branch"), who resigned after being disciplined for performance issues.  (Doc. No. 34-4 at 10-11; Doc. No. 37-4 at ¶¶ 2-5.)  Phillips reviewed Lloyd's August 2016 application for intermittent FMLA leave and became concerned that Lloyd's condition may be disqualifying for her position.  (Doc. No. 34-4 at 12-13.)  As a result, Phillips faxed Lloyd's FMLA request to GCRTA's third-party medical examiner, Dennis Frinzl ("Frinzl"), for his review.  (*Id.*)  Frinzl is a physician's assistant and certified medical examiner for the Federal Motor Carriers Association.  (Doc. No. 36-1 at 9.)  He has been performing DOT exams for GCRTA for approximately thirty years.  (*Id.* at 15.)  Frinzl reviewed Lloyd's FMLA request and determined that Lloyd needed to be pulled off her route for a fitness for duty exam.  (Doc. No. 34-4 at 12.)  At his deposition, Frinzl could not recall sending any other employees for an exam based on emotional distress or a psychological disorder other than Lloyd.  (Doc. No. 36-1 at 37.)

On August 24, 2016, Lloyd was pulled from work and informed that she needed to meet with Frinzl.  (Doc. No. 34-1 at 42.)  Two days later, Lloyd met with Frinzl, and Frinzl inquired as to whether Lloyd had a Commercial Driver's License ("CDL").  (*Id.*)  When Lloyd informed Frinzl that she did not have a CDL, Frinzl ended the exam and sent Lloyd back to work on the mistaken belief that GCRTA employees without a CDL did not need to meet DOT guidelines.  (*Id.*; Doc. No. 36-1 at 22-23.)  After this mix-up, Scott Ferraro ("Ferraro"), GCRTA's Director of Labor and Employee Relations, informed Frinzl that GCRTA requires all operators, whether they have a CDL or not, to follow the DOT guidelines.  (Doc. No. 34-3 at 24.)

Thus, on August 29, 2016, Lloyd was pulled from work again.  (Doc. No. 46-1 at ¶ 14.)  Lloyd went back to see Frinzl on August 30, 2016.  (Doc. No. 34-1 at 44.)  PTSD is not an automatically disqualifying condition under the DOT guidelines and is not listed in the Federal Motor Carrier Safety Administration Medical Examiner Handbook (the "Examiner Handbook") under mental health disorders.  (Doc. No. 36-1 at 31-32, 61.)  The Examiner Handbook also indicates that a medical examiner should ask several questions when conducting a psychological examination.  (*Id.* at 110.)  Before asking any of the suggested questions, however, Frinzl asked Lloyd to sign a medical release so he could determine the extent of her condition.  (Doc. No. 34-1 at 45; Doc. No. 36-1 at 56.)  Frinzl indicated he was not actually conducting an exam that day because he was "not going to go fish at that time" and "need[ed] the records to see what's going on."  (Doc. No. 36-1 at 56.)  Because Lloyd's position as a train operator affects public safety, Frinzl was concerned about the frequency of the flare-ups of her condition as indicated on her FMLA application, wanted more information on the type of mood disorder that Lloyd was suffering from, and wanted to know whether she was suicidal, homicidal, or a threat to the public or herself.  (*Id.* at 72-75.)

6

Lloyd asserts the release that Frinzl requested related to "all" of her medical records.  (Doc. No. 34-1 at 45-46; Doc. No. 46-1 at ¶ 15.)  However, Defendants contend GCRTA only asked Lloyd to release her medical records from July 2015 to the present—which was August 2016 at that time— and have submitted the release form presented to Lloyd in conjunction with their Motion for Summary Judgment.  (Doc. No. 35-1 at 32.)  Nonetheless, it is undisputed that Lloyd refused to sign the medical release.  (Doc. No. 34-1 at 45-46.)  Lloyd was concerned about her privacy and did not want to disclose her medical records to her employer.  (*Id.*)  As a result, Frinzl did not clear her to return to work.  (Doc. No. 46-1 at ¶ 17.)  Neither Frinzl nor anyone else at GCRTA informed Lloyd that she could seek a second opinion as to her fitness for duty.  (*Id.* at ¶¶ 33-34.)

About a month later, on September 21, 2016, Lloyd spoke with Ferraro and inquired as to why she was pulled off work.  (*Id.* at ¶ 18.)  On September 26, 2016, Ferraro sent Lloyd a letter providing that GCRTA was holding Lloyd from work because she had not been cleared to work as an operator and had refused to provide the requested medical history.  (Doc. No. 35-1 at 19.)  Ferraro further wrote that "[i]f your physician clears you to return to work without restrictions, please contact Matia Phillips in Occupational Health Immediately, so GCRTA may process your return to work," and "[i]f you decide to have your physician provide your medical history for further consideration in your ability to work as Operator, please submit to East Side Occupational Health for review."  (*Id.*)

In response, on October 4, 2016, Lloyd provided Phillips a letter from Dubey stating that Lloyd was able to return to work without restrictions.  (Doc. No. 46-1 at ¶ 21.)  Specifically, the letter stated:  "Ms. Lloyd has no restrictions that prevent her from performing the duties required of her employment.  If or when episodes occur related to her listed diagnosis, Ms. Lloyd should take time

7

off and seek remedy, as noted in my recommendations on her FMLA forms."  (Doc. No. 35-1 at 27.)
However, GCRTA still did not clear Lloyd to return to work.  (Doc. No. 46-1 at ¶ 22.)

Instead, Frinzl wrote Dubey and informed him that he could not clear Lloyd to return to work
with the documentation he currently possessed and that he needed "Ms. Lloyd's medical records or
a letter from you indicating that Ms. Lloyd is not suicidal, not homicidal, or has any specific mood
disorder and if so what type of specific mood disorder."  (Doc. No. 35-1 at 28.)  Dubey did not
respond to this letter, so Frinzl followed up in a letter on January 13, 2017, repeating his request.  (*Id.*
at 29.)  On February 1, 2017, Dubey responded and advised Frinzl that Lloyd had been unresponsive
to his requests for the records from her psychologist's office and to make an appointment with him.
(*Id.* at 30.)

On April 10, 2017, GCRTA held a "Six-Month Absence Meeting" to address Lloyd's
extended absence.  (Doc. No. 34-1 at 74.)  During the meeting, GCRTA once again asked Lloyd to
sign a release for her medical records, and Lloyd refused.  (*Id.* at 75.)  Thus, she remained off work.
Subsequently, on June 14, 2017, Ferraro and other managers reviewed how long Lloyd had been
absent from work and decided to terminate her employment because she had violated the long-term
absence provision of GCRTA's attendance policy providing for termination after an absence of six
months.  (Doc. No. 34-3 at 11-13.)  However, according to Lloyd, pursuant to the Collective
Bargaining Agreement ("CBA") between GCRTA and train operations, train operators are allowed a
one-year extended absence prior to termination.  (Doc. No. 46-1 at ¶ 39, Ex. 1.)

Lloyd then filed a grievance challenging her termination.  (*Id.* at ¶ 26.)  Although the timing
of the filing of Lloyd's grievance is not clear, it appears that while her grievance was pending, Lloyd
executed a medical release for Dubey to review her psychological records and, on January 30, 2018,

submitted a second letter from Dubey stating that there was no evidence that Lloyd was a threat to herself or others, that she was not on any medication, and that she denied she had any symptoms related to mental health at a recent office visit.  (*Id.* at ¶¶ 27-28; Doc. No. 35-1 at 31.)  GCRTA still did not reinstate Lloyd at this time, and her grievance proceeded to arbitration.  On September 17, 2018, the arbitrator issued a ruling reinstating Lloyd's employment and requiring GCRTA to pay backpay to Lloyd from January 30, 2018.  (Doc. No. 46-1 at ¶ 31.)  In October 2018, Lloyd then went back to Frinzl for a fitness for duty exam and was cleared to return to work.  (*Id.* at ¶ 32.)

### b.  Procedural History

On July 9, 2018, Lloyd filed a Complaint in this Court against Defendants, setting forth claims for disability discrimination in violation of the Americans with Disabilities Act ("ADA") and Ohio law, retaliation in violation of the FMLA, and gender discrimination in violation of Title VII and Ohio law.  (Doc. No. 1.)  Lloyd subsequently amended her Complaint twice in response to Motions to Dismiss filed by Barnett.  (*See* Doc. Nos. 7, 11, 12, 16, 19, 20.)  The Second Amended Complaint, which is now the operative version, sets forth claims against GCRTA for (1) disability discrimination in violation of the ADA and Ohio law; (2) retaliation in violation of the FMLA; and (3) gender discrimination in violation of Title VII and Ohio law.  (Doc. No. 20 at ¶¶ 62-127.)  The Second Amended Complaint contains a single claim under Ohio law against Barnett for aiding and abetting GCRTA's alleged discriminatory conduct towards Lloyd.  (*Id.* at ¶¶ 128-40.)

On January 31, 2020, Defendants filed a Motion for Summary Judgment, seeking the dismissal of all of Lloyd's claims.  (Doc. No. 27.)  Lloyd filed a brief in opposition to Defendants' Motion for Summary Judgment on March 31, 2020, to which Defendants replied on April 17, 2020. (Doc. Nos. 46, 49.)

## II.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*,

10

593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must

'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v.*

*Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d

at 150).

## III.    Analysis

### a.  Disability Discrimination

With regard to Lloyd's disability discrimination claims under the ADA and Ohio law,

GCRTA argues that summary judgment is appropriate because Lloyd cannot establish a prima facie

case of discrimination.  (Doc. No. 37 at 12-13.)  Specifically, GCRTA asserts that Lloyd cannot show

she was capable of performing her job or that she was fired because of her disability.  (*Id.*; Doc. No.

49 at 4-5.)  Alternatively, GCRTA argues that its concern regarding the safe operation of its rail trains

was a legitimate, nondiscriminatory reason to pull Lloyd from duty, which Lloyd cannot show was

pretext for discrimination.  (Doc. No. 37 at 13-15; Doc. No. 49 at 6-8.)  Conversely, Lloyd asserts

she has submitted sufficient evidence to establish both a prima facie case and that GCRTA's

legitimate, nondiscriminatory reason is pretextual.  (Doc. No. 46 at 14-19.)  Upon review, the Court

concludes that Lloyd's disability discrimination claims may move forward.

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a

qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "The Ohio Supreme Court has

found that because the 'federal Americans with Disabilities Act (ADA) is similar to the Ohio

handicap discrimination law . . . . [w]e can look to regulations and cases interpreting the federal Act

for guidance in our interpretation of Ohio law." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104 n.3 (6th Cir. 2008). Thus, courts often analyze claims under the ADA and Ohio law together. *See e.g., id.*; *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004).

In this case, Lloyd acknowledges that she relies on circumstantial evidence in support of her disability discrimination claims. (Doc. No. 46 at 14.) "Where, as here, the plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, we require the plaintiff to establish a prima facie case, followed by the familiar *McDonnell Douglas* burden-shifting." *Talley*, 542 F.3d at 1105. "To prove a prima facie case of disability discrimination, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). "Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its actions." *Talley*, 542 F.3d at 1105 (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001)). Finally, "[i]f the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Id.*

Thus, the Court must first determine whether Lloyd has met her burden to establish a prima facie case. As an initial matter, the Court notes that GCRTA does not dispute that Lloyd was disabled. (Doc. No. 37 at 12.) As such, the first prong of Lloyd's prima facie case is satisfied.

With respect to the second element, whether Lloyd was otherwise qualified to perform the essential functions of her position, with or without accommodation, the Court also finds that Lloyd has met her burden at this stage. GCRTA argues that Lloyd cannot satisfy this requirement because,

by refusing to sign a release of her medical records and cooperate with GCRTA's request for a fitness exam, she would not allow GCRTA to determine whether she was capable of safely and substantially performing the essential functions of her job.  (Doc. No. 37 at 12-13; Doc. No. 49 at 4-5.)  However, Lloyd has produced evidence showing that she performed her job without any issues for about a year after she was diagnosed with PTSD prior to GCRTA removing her from work.  During this time, there is no indication that Lloyd ever endangered her passengers or operated her train in an unsafe manner.  (Doc. No. 34-3 at 22; Doc. No. 34-4 at 26; Doc. No. 46-1 at ¶ 10.)  Consequently, Lloyd has established a genuine dispute of material fact as to her ability to perform her job as a train operator despite her disability.

As to the third element, whether Lloyd suffered an adverse employment action because of her disability, the parties dispute whether GCRTA removed Lloyd from work and eventually terminated her because of her disability.  Relevant to this question is whether GCRTA was justified in requiring Lloyd to undergo a fitness exam and provide a release of her medical records, which caused her removal and eventual termination when she refused to cooperate.  Indeed, "an examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination."  *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 813 (6th Cir. 1999); *accord James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 250 (6th Cir. 2009) ("[B]ecause Goodyear had a valid reason to demand the [functional capacity evaluation], it did not perpetrate an adverse employment action under the ADA as a matter of law.").  And while Lloyd's removal from work and termination are certainly adverse employment actions, if those actions were based on her refusal to undergo a valid examination, she cannot establish the causal connection necessary to prove a prima facie case of discrimination.  *See Sullivan*, 197 F.3d at 813 ("[W]hile the district's subsequent suspending of

13

Sullivan is an adverse job action, it was based on his refusal to undergo the valid examinations, which is not a discriminatory reason.").  Thus, while the parties mainly assess whether GCRTA could require a medical exam in the context of their analysis with respect to pretext, the Court finds it appropriate to consider the issue here with regard to Lloyd's prima facie case.

Once an employee has been hired, the ADA provides that "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  "The employer bears the burden of proving that a medical examination is job-related and consistent with business necessity by demonstrating that: '(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.'"  *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (quoting *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007)).  Further, to satisfy the business-necessity standard, "the individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business."  *Id.*; *see also Pena v. City of Flushing*, 651 F. App'x 415, 421 (6th Cir. 2016) ("[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job.") (quoting *Sullivan*, 197 F.3d at 811).

With respect to whether an employee poses a direct threat, employers may consider "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm."  *James*, 354 F. App'x at 249

14

(quoting *EEOC v. Prevo's Family Mkt.*, 135 F.3d 1089, 1095 (6th Cir. 1998)).  In addition, the Sixth Circuit has recognized that "'special circumstances' may exist in workplaces where employees respond to stressful situations and shoulder responsibility for public safety." *Kroll*, 763 F.3d at 626. "In these 'public safety' workplaces, an employer may be justified in requesting a psychological exam on slighter evidence than in other types of workplaces because employees are 'in positions where they can do tremendous harm if they act irrationally,' and thus they pose a greater threat to themselves and others." *Id.* (quoting *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999)).

Here, the Court agrees with GCRTA that it was entitled to require Lloyd to undergo a fitness exam and inquire into her medical records based on evidence that she may pose a threat to public safety.  Frinzl ordered the medical exam and required a release of Lloyd's medical records based on the information he reviewed in Lloyd's FMLA application, which indicated that she would suffer from episodic flare-ups of her "PTSD/mood disorder" approximately four times a month during which she would be incapacitated for one to five days.  (Doc. No. 35-1 at 14.)  Frinzl did not know whether these periods of incapacity could occur while Lloyd was operating a train and was concerned about public safety because of the nature of Lloyd's position as a train operator.  (Doc. No. 36-1 at 72-75.)  This concern is in line with GCRTA's Manual and DOT guidelines, which provide that drivers of commercial motor vehicles should not have any "mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely," and that "[d]isorders of a periodically incapacitating nature, even in the early stages of development, may warrant disqualification."  (Doc. No. 35-1 at 33-34.)  Thus, the Court finds that Frinzl had a reasonable belief based on objective evidence that Lloyd posed a threat to the safety of

15

herself or others, especially given the slightly lower standard applied to positions that affect public safety.

Lloyd argues this evidence is insufficient to justify GCRTA's actions because she performed her job and operated trains safely for a year while suffering from PTSD before being removed from work and never utilized her FMLA leave to miss work or leave early.  (Doc. No. 46 at 17-19.) However, GCRTA asserts she was only permitted to operate for that year because GCRTA's former occupational health specialist, Branch, failed to recognize that her PTSD may disqualify her under the DOT regulations.  (Doc. No. 37 at 15 n.4.)  Moreover, GCRTA cannot be required to wait until an incident occurs to justify further investigation when they knew Lloyd had an unknown mood disorder and would have periods of incapacity approximately four times a month, especially given the severity of the potential harm that could occur if a train is not operated safely.

Lloyd also asserts that GCRTA was not justified in continuing to withhold her from work after she submitted the October 4, 2016 letter from her primary care doctor, Dubey, indicating that "Ms. Lloyd has no restrictions that prevent her from performing the duties required of her employment."  (Doc. No. 35-1 at 27.)  However, the letter also provided that "[i]f or when episodes occur related to her listed diagnosis, Ms. Lloyd should take time off and seek remedy, as noted in my recommendations on her FMLA forms."  (*Id.*)  Thus, Dubey's letter failed to address the concerns that Frinzl had regarding Lloyd's episodic flare-ups.  It also did not indicate the type of mood disorder she suffered from and whether she was suicidal or homicidal.  Frinzl attempted to follow up to obtain such information, but received no additional information from Dubey because Lloyd became unresponsive.  (*Id.* at 28-30.)  Consequently, Dubey's October 4, 2016 letter does not undermine the reasonableness of continuing to withhold Lloyd from work.

16

However, while GCRTA was justified in requiring a medical exam and a release of her medical records, Lloyd has raised a genuine issue of material fact as to whether the scope of the inquiry exceeded permissible bounds.  "[A]ny examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Sullivan*, 197 F.3d at 811-12.  Indeed, "[a] medical examination or inquiry under § 12112(d)(4) 'is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance'" *Jackson v. Regal Beloit Am., Inc.*, No. 16-134-DLB-CJS, 2018 WL 3078760, at *9 (E.D. Ky. June 21, 2018) (quoting *Sullivan*, 197 F.3d at 812).  "Therefore, 'an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity.'"  *Id.* (quoting *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 782-83 (N.D. Ohio 2002)).

In this case, GCRTA's concern regarding Lloyd's operation of a train solely related to her PTSD and mood disorder.  However, according to Lloyd, GCRTA required her to sign a release for all of her medical records.  (Doc. No. 34-1 at 45-46; Doc. No. 46-1 at ¶ 15.)  Such a request is clearly overbroad and does not comply with the job-related and business necessity requirement for such inquiries.  GCRTA contends it only asked Lloyd to release her medical records from 2015 to 2016, the years in which she was diagnosed with PTSD.  (Doc. No. 49 at 5.)  However, even this request likely would be improper in scope because, although it is limited temporally, there is no indication that the release was limited to Lloyd's psychological records.  As a result, it would still include a release of records unrelated to an inquiry into Lloyd's PTSD and mood disorder, such as records related to her physical health.  Thus, a jury could reasonably find that GCRTA's inquiry into Lloyd's disability was overbroad, and, as a result, that the subsequent withholding of Lloyd from work and

17

her termination were based on her disability.  As such, Lloyd has satisfied her burden at the summary judgment stage to establish a prima facie case of disability discrimination.

GCRTA contends that even if Lloyd establishes a prima facie case, summary judgment is warranted because it has articulated a legitimate, nondiscriminatory reason for pulling Lloyd off duty—that she was not medically cleared because of her refusal to cooperate and was a risk to public safety.  (Doc. No. 37 at 13-15.)  However, "to the extent an employer's medical-examination request or disability-inquiry demand are unlawful, an employee's refusal to relent to such unlawful requests does not constitute a legitimate, nondiscriminatory reason for taking adverse employment action against that employee.  Rather, it is the opposite: an illegitimate and unlawful reason." *Jackson*, 2018 WL 3078760, at *12.  Thus, because the Court has concluded that there is a genuine issue of material fact as to whether GCRTA's disability inquiry was overbroad under the ADA—and therefore not job-related or consistent with business necessity—there is also a genuine dispute as to whether Lloyd's refusal to comply with the demand is a legitimate, nondiscriminatory reason for her removal from work and eventual termination.  As a result, summary judgment is not appropriate as to Lloyd's claims against GCRTA for disability discrimination.

### b.  FMLA Retaliation

Next, GCRTA argues that summary judgment is warranted as to Lloyd's retaliation claim under the FMLA because she cannot establish a causal connection between her protected FMLA activity and any adverse employment action.  (Doc. No. 37 at 15.)  Alternatively, GCRTA asserts it had a legitimate, nondiscriminatory reason to pull Lloyd from duty, which she cannot show is pretextual.  (*Id.* at 16.)  In response, Lloyd asserts the temporal proximity between her latest FMLA request and her removal from work, as well as the fact that she was never written up for late trains

prior to requesting leave under the FMLA, is sufficient to establish a causal connection between her FMLA request and subsequent removal from work and termination.  (Doc. No. 46 at 19-21.)  She also claims that GCRTA's reliance on public safety concerns is pretextual for a variety of reasons. (*Id.* at 21-22.)  The Court finds that summary judgment in favor of GCRTA on Lloyd's FMLA retaliation claim is warranted.

"The issue in an FMLA retaliation claim is whether an employer retaliated or discriminated against an employee because the employee invoked her FMLA rights." *Brady v. Potter*, 476 F. Supp. 2d 745, 758 (N.D. Ohio 2007).  Once again, Lloyd relies on indirect evidence and the *McDonnell Douglas* burden-shifting framework to prove her claim.  (Doc. No. 46 at 19-22.)  Pursuant to that framework, the plaintiff bears the initial burden to establish a prima facie case by demonstrating that "(1) she notified her employer of her intent to take FMLA protected leave; (2) she suffered adverse employment action; and (3) there exists a causal connection between the plaintiff's exercise of her FMLA rights and the adverse employment action." *Brady*, 476 F. Supp. 2d at 758.  If the plaintiff satisfies this initial burden, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.*  Finally, "[i]f the employer articulates such a reason, then the burden shifts back to the plaintiff to demonstrate that the reason is pretextual." *Id.*

Here, even assuming, *arguendo*, that Lloyd can establish a prima facie case, her claim fails because she has not presented sufficient evidence to demonstrate that GCRTA's proffered legitimate, nondiscriminatory reason is pretextual.  Once a prima facie case has been established, an employer satisfies its burden "if it produces evidence of 'a legitimate nondiscriminatory reason' for its conduct." *Travers v. Cellco P'ship*, 579 F. App'x 409, 415 (6th Cir. 2014).  Here, GCRTA has

19

presented evidence that it removed Lloyd from work because the effect her PTSD and mood disorder may have on passenger safety and eventually terminated her because she failed to cooperate with the fitness for duty exam and was therefore off work for months in violation of GCRTA's attendance policy.  (Doc. No. 37 at 15; Doc. No. 49 at 8.)  Thus, GCRTA has met its burden to articulate a legitimate, nondiscriminatory reason for its actions.

As a result, the burden shifts back to Lloyd to demonstrate that GCRTA's reasons are pretextual.  In general, at the pretext stage, the court considers whether the plaintiff "has adduced evidence which would enable a factfinder to conclude that [the defendant's] stated reason for terminating her is not the true reason and is simply a pretext for unlawful retaliation."  *Bryson v. Regis Corp.*, 498 F.3d 561, 572 (6th Cir. 2007).  "The plaintiff must always 'produc[e] sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally discriminated against him."  *Travers*, 579 F. App'x at 416 (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).  "A plaintiff can show that an employer's purported reason for taking an adverse employment action is pretextual if it (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) was insufficient to motivate the employer's action."  *Id.* (citations and internal quotations omitted).  "The three-part test need not be applied rigidly.  Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'"  *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)).

Lloyd does not specify under which method she seeks to demonstrate pretext.  However, she first appears to argue that GCRTA's concern about public safety was insufficient to motivate its actions because she had performed as a train operator for a year with no safety issues and without

20

requesting off from work due to her PTSD and because Frinzl did not recall sending any other employees for a fitness for duty exam for individuals with emotional distress, rather than a physical impairment.  (Doc. No. 46 at 17-19, 21-22.)  However, as detailed above, GCRTA had sufficient objective evidence at the time that it pulled Lloyd from work that she may pose a threat to the safety of passengers.  As such, Lloyd's argument in this regard is insufficient to show pretext.

Lloyd also appears to argue that GCRTA's stated reasons did not actually motivate its actions because (1) Frinzl failed to conduct Lloyd's exam in accordance with the Examiner Handbook by failing to inquire into the effects of Lloyd's PTSD prior to asking for a medical release; (2) Frinzl disregarded Dubey's October 4, 2016 letter stating that Lloyd could perform her job with no restrictions; and (3) GCRTA never informed Lloyd that she could obtain a second opinion on the fitness for duty exam.  (*Id.* at 18-19.)  The Court finds Lloyd's arguments unpersuasive.  To establish pretext by showing that an employer's stated reasons did not actually motivate its actions, a plaintiff must "attack[ ] the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant.'"  *Travers*, 579 F. App'x at 417 (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000)).  "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008) (citation omitted).

In this case, the Court has already addressed the fact that Dubey's letter did not address all of Frinzl's concerns, and Frinzl was justified in withholding medical clearance until he had more information.  Lloyd has also not cited to any authority showing that GCRTA was under any duty to inform her that she could seek a second opinion regarding her fitness for duty or evidence that

21

GCRTA regularly informed other employees who had not requested FMLA leave of this right. Finally, at his deposition, Frinzl testified that he was not actually conducting an exam when he first saw Lloyd because he did not want to go fishing for information before acquiring her medical records. (Doc. No. 36-1 at 56.)  In addition, even if Frinzl did not execute the exam in line with the Examiner Handbook, it is not enough circumstantial evidence to show that GCRTA was actually acting to retaliate against Lloyd instead of acting to ensure the safety of its passengers in the face of ample evidence showing Lloyd's condition may disqualify her from her position as a train operator.

Because Lloyd has not shown that GCRTA's initial decision to remove her from work was motivated by an intent to retaliate against her, Lloyd also cannot show that GCRTA's decision to terminate her based on her extended absence was pretext for retaliatory motives.  Even assuming her termination was technically improper under the CBA because she had not yet been absent for a full year, her initial removal was not in retaliation for her FMLA request and the termination occurred almost a year after her FMLA request.  As such, there is no evidence connecting her termination to her protected activity under the FMLA.

Thus, Lloyd has not met her burden to show that GCRTA's legitimate, nondiscriminatory reasons for her removal from work and termination are pretextual.  As such, summary judgment is warranted as to her FMLA retaliation claim.

### c.  Gender Discrimination

GCRTA also argues that summary judgment on Lloyd's gender discrimination claims under Title VII and Ohio law is warranted because Lloyd cannot establish a prima facie case of discrimination.  (Doc. No. 37 at 16-18.)  Specifically, GCRTA asserts that Lloyd has not identified any similarly situated employees that were late as often as her that were treated more favorably, and

that being sent home early one day from work with pay is not an adverse employment action. (*Id.*; Doc. No. 49 at 9-11.) Lloyd disputes these conclusions and contends that she has established a prima facie case of gender discrimination with respect to both the write-ups she received for late trains and for being sent home after she arrived late to Tower City. (Doc. No. 46 at 22-23.) She also asserts she has provided sufficient evidence showing that GCRTA's articulated legitimate, nondiscriminatory reasons for its actions are pretextual. (*Id.* at 23-24.) The Court agrees with GCRTA that Lloyd cannot establish a prima facie case, and, therefore, the Court finds summary judgment against Lloyd on her gender discrimination claims appropriate.

Lloyd's claims under Title VII and Ohio law "may be analyzed together . . . because 'Ohio's requirements are the same as under federal law.'" *Russell*, 537 F.3d at 604 (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003)); *Lindsey*, 295 F. App'x at 760 n.1 ("The Ohio Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination and retaliation claims."); *see* 42 U.S.C. § 2000e-2; Ohio Rev. Code § 4112.02. Under Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In the absence of direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007). As noted above, under the *McDonnell Douglas* framework, "the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination." *Johnson v. Kroger* Co., 319 F.3d 858, 866 (6th Cir. 2003). To establish a prima facie case of discrimination, a plaintiff must "show that 1) he is a member of a

protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000). "The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to 'articulate some legitimate, nondiscriminatory reason' for taking the challenged action." *Kroger*, 319 F.3d at 866 (quoting *Univ. of Cincinnati*, 215 F.3d at 573). Finally, "[i]f the defendant is able to satisfy this burden, the plaintiff must then 'prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.* (quoting *Univ. of Cincinnati*, 215 F.3d at 573).

With respect to Lloyd's claims related to the written warnings she received from Barnett for her trains running late, the Court agrees with GCRTA that Lloyd has not established a prima facie case of discrimination because she has failed to identify any similarly situated employees that were treated more favorably. To establish a prima facie case of gender discrimination, Lloyd must show "that she was treated less favorably than a male employee who was 'similarly situated' to her 'in all relevant respects.'" *Choate v. Advance Stores Co., Inc.*, 656 F. App'x 88, 91 (6th Cir. 2016) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)). In the disciplinary context, the Sixth Circuit has "held that to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of '*comparable seriousness*.'" *Wright*, 455 F.3d at 710 (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). Factors relevant to this inquiry include "whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would

24

distinguish their conduct or the employer's treatment of them for it.'"   *Id.* (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

In this case, Lloyd claims she was written up for late trains even though she stated that her train was late because of her compliance with the speed limits on her route and necessary restroom breaks, and points to three male train operators—Fazl, Kenny Jackson ("Jackson"), and Ricardo Wiggins ("Wiggins")—that she asserts were not written up for late trains due to restroom breaks. (Doc. No. 46 at 23.)  However, there is no evidence that any of the three male train operators' trains were late as often as Lloyd's train, if at all.  To wit, Jackson testified that he was never late as a result of taking a restroom break.  (*See* Doc. No. 50-1 at 15-16, 24-25.)  Wiggins admitted that he had previously been late as a result of taking a restroom break, but, although he did not recall the exact number of times that he was late, stated it was very rare.  (Doc. No. 50-3 at 19-20 ("Whenever I'm taking a [restroom break], I'm leaving out on time.  So that's the difference with me.  I never was late pretty much when I was an operator.").)  Fazl also admitted to having been late after taking a restroom break, but Lloyd has not identified any evidence as to how often he was late.  (Doc. No. 50-2 at 14-15.)[2]  In contrast, it is undisputed that prior to her First Written Reminder, from September 8, 2015 to May 3, 2016, Lloyd's train was late twenty-one times.  (Doc. No. 37-2 at ¶ 4.)  In addition, she was late again on May 16, 2016, which resulted in her Second Written Reminder.  (Doc. No. 34-2 at 58.)  GCRTA has also submitted evidence that no other train operator was late as often as Lloyd and that even similarly situated train operators were not late to the same degree, frequency, and severity as Lloyd.  (Doc. No. 34-2 at 56; Doc. No. 49-2 at ¶ 6.)  Thus, Lloyd has failed to produce evidence

---

[2] Defendants submitted evidence that Fazl was late only once from April 25, 2016 to August 31, 2016.  (Doc. No. 49-2 at ¶ 4.)  Because Lloyd was written up in May 2016, the Court finds this evidence only minimally relevant.

demonstrating that Fazl, Jackson, and Wiggins were late as frequently as Lloyd or to the same severity. As a result, they cannot be considered similarly situated to Lloyd for purposes of her gender discrimination claims, and she has failed to establish a prima facie case with respect to her First and Second Written Reminders for late trains.

Next, with regard to the incident at Tower City involving Newell, the Court finds that Lloyd's claim fails because she did not suffer any adverse employment action. To satisfy the third element of a prima facie case of discrimination, plaintiffs must demonstrate that they suffered "a materially adverse change in the terms and conditions" of their work. *Foster v. Michigan*, 573 F. App'x 377, 394 (6th Cir. 2014) (citation omitted). "Examples of actions that rise[] to this level 'include termination of employment, a demotion . . . a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *White v. Reynolds*, No. 2:15-cv-2091, 2016 WL 5914204, at *5 (S.D. Ohio Oct. 11, 2016) (quoting *Foster*, 573 F. App'x at 394). Discipline may constitute "an adverse employment action when it involves suspension from work for several days or when the suspension is without pay." *Rose v. Buckeye Telesystem, Inc.*, 181 F. Supp. 2d 772, 776 (N.D. Ohio 2001). However, multiple courts have held that a "one-day suspension with pay does not constitute an adverse employment action." *Id.* at 777; *accord White*, 2016 WL 5914204, at *5-6 (holding plaintiff's one-day suspension with pay was not materially adverse under the law); *see also Reese v. Robert Bosch Corp.*, No. 1:05-CV-555, 2006 WL 2244136, at *6 (W.D. Mich. Aug. 4, 2006) (interpreting Michigan law, but relying on federal employment cases to supports its conclusion that "sending Plaintiff home for one shift with pay is not a materially adverse employment action giving rise to liability").

In the instant matter, on March 11, 2016, GCRTA sent Lloyd home early after she arrived late to Tower City to pick up her train.  (Doc. No. 34-1 at 91-92.)  GCRTA asserts that Lloyd was sent home "with pay" (Doc. No. 49 at 11), and Lloyd has not identified any evidence to contest that statement or to show that she suffered any loss of pay or other adverse consequences from being sent home.  Consequently, Lloyd has also failed to establish a prima facie case of gender discrimination with respect to being sent home early because she did not suffer an adverse employment action.  Accordingly, the Court will grant GCRTA's Motion for Summary Judgment as to Lloyd's gender discrimination claims.

### d.  Aiding and Abetting

Finally, the parties advance various arguments regarding Lloyd's claim against Barnett under Ohio law for aiding and abetting GCRTA's gender discrimination and retaliation based on Lloyd's gender discrimination complaint.  (Doc. No. 37 at 18; Doc. No. 46 at 24-25; Doc. No. 49 at 11-12.) However, the Court finds that Lloyd's claim fails for the simple reason that Lloyd failed to establish any underlying discriminatory or retaliatory acts based on Lloyd's gender or gender discrimination complaint.

Ohio Revised Code § 4112.02(J) makes it unlawful "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice."  Ohio Rev. Code § 4112.02(J).  However, if a plaintiff fails to establish any underlying unlawful discriminatory conduct, his or her aiding and abetting claim also fails.  *See, e.g.*, *Toth v. Cardinal Health 414 LLC*, No. 1:17-CV-00370, 2020 WL 1275095, at *10 (S.D. Ohio Mar. 17, 2020) ("As Plaintiff's disability discrimination and age discrimination claims fail, his claims of aiding and abetting disability discrimination and age discrimination under Ohio law necessarily fail.");

*Demassimo v. Sagamore Hills Twp.*, No. 5:16CV1820, 2017 WL 6344653, at *6 (N.D. Ohio Dec. 11, 2017) ("The aiding and abetting claim fails, because Plaintiff has not established an underlying violation."); *Woolf v. City of Streetsboro*, No. 5:09 CV 1570, 2010 WL 4105550, at *15 (N.D. Ohio Oct. 18, 2010) ("As plaintiff has not established the elements of her sexual discrimination and sexual harassment claims, her claim for aiding and abetting sexual harassment under Ohio law also fails."). Because Lloyd has not presented sufficient evidence in support of her gender discrimination claims against GCRTA to survive summary judgment or even alleged a retaliation claim based on her gender discrimination complaint, her claim against Barnett for aiding and abetting also necessarily fails.

## IV. Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 37) is GRANTED IN PART and DENIED IN PART. Defendants' Motion is DENIED as to Lloyd's disability discrimination claims, and GRANTED in all other respects.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
Date: August 27, 2020              U. S. DISTRICT JUDGE